UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

UNITED STATES OF AMERICA                                                    PLAINTIFF

*Filed Electronically*
vs.                                         CRIMINAL ACTION NO. 4:10CR-13-M

RANDALL MULHOLLEN                                                          DEFENDANT

**SENTENCING MEMORANDUM AND**
**OBJECTIONS TO THE PRESENTENCE REPORT**

The United States submits the following Sentencing Memorandum and objection to the presentence report with regard to Defendant Randall Mulhollen.  For the reasons set forth below, the United States recommends that the Court should apply an intended loss figure of more than $1 million which results in a total adjusted offense level of 19, resulting in a sentencing range of 30 to 37 months.

**Background**

On May 12, 2010, the Defendant pleaded guilty to a one-count Indictment charging him with stealing a "trade secret" from Swedish Match Tobacco.  Swedish Match Tobacco is an international company with a manufacturing facility located in Owensboro, Kentucky.  Among other types of tobacco products, Swedish Match manufactures and sells moist snuff tobacco. The Defendant was formerly a product development chemist for tobacco products for Reynolds America, which was recently purchased by Swedish Match.  In March of 2009 Mr. Mulhollen was terminated from his position with the company.

Following termination from his position, the Defendant began working for Good Times Tobacco (GTT), a company located in Florida.  As part of his employment with GTT, the

Defendant was trying to develop a moist snuff tobacco product for GTT to manufacture and market that would compete with Swedish Match.  During his employment by GTT, the defendant approached its principles with the idea of his providing a fully-developed moist snuff "starter tobacco" product.  Starter tobacco is essentially the "secret ingredient" for each individual tobacco product that a tobacco companies manufacturers.  All specific tobacco brands are developed from a unique starter tobacco.  The starter tobacco, among other things, ultimately gives each individual tobacco product its distinct flavor and taste.  The starter tobacco the defendant attempted to steal was an amount that could have been used to generate an unlimited supply of starter tobacco and, therefore, an unlimited supply of finished moist snuff tobacco.  The starter tobacco the Defendant attempted to steal was developed over a period of decades through extensive  research and development.  The actual research and development costs of the starter tobacco is difficult to quantify because of the long research and development period, but the actual costs is easily in the hundreds of thousands if not millions of dollars.

      To obtain the starter tobacco product from Swedish Match following his termination, the Defendant approached a current employee of Swedish Match that he knew would have access to the product.  He offered her $1,000 to obtain a specific starter tobacco product.  The employee immediately reported his proposition to her management, who eventually on contacted the Federal Bureau of Investigation (FBI) agent in Owensboro.  The FBI set up an undercover sting operation in which the employee delivered what appeared to be the requested starter tobacco to the Defendant.  The Defendant, as he originally offered, gave her $1,000 for the starter tobacco.  Following the transaction he immediately took the starter tobacco home, shrink wrapped it, and placed it his freezer.  Shortly afterward, the FBI executed a search warrant on the Defendant's

home. Following the warrant, the Defendant confessed to the crime. Later, after the Indictment the Defendant agreed to attempt to cooperate with the FBI and make consensually monitored phone calls to the principles of GTT in Florida. The end result of those calls was that the principles appeared to have little knowledge of the scheme to steal the starter tobacco from Swedish Match.

## Guideline calculation

The Presentence Report calculated the following offense level as follows:

| | |
|---|---|
| USSG § 2B1.1 (a)(2) [base offense level]: | 6 |
| USSG § 2B1.1 (b)(1)(A) [no loss]: | 0 |
| USSG § 3E1.1(a) [acceptance of responsibility]: | -2 |
| Total Offense level: | 4 |

The United States for the reasons detailed below, respectfully asks to Court to apply an intended loss amount of more then $1 million. If the Court applies this loss amount then the total adjusted offense level will increase from 4 to 19 based on the following Guideline calculation:

| | |
|---|---|
| USSG § 2B1.1 (a)(2) [base offense level]: | 6 |
| USSG § 2B1.1 (b)(I)(A) [loss exceeding $1 million]: | +16 |
| USSG § 3E1.1(a) [acceptance of responsibility]: | -3 |
| Total Offense level: | 19 |

The sentencing range for a total adjusted offense level of 19 is 30 to 37 months.

## Argument

Unlike most other intellectual property offenses, which are sentenced under U.S.S.G. § 2B5.3, completed Economic Espionage Act (EEA) offenses (both § 1831 and § 1832) are sentenced under U.S.S.G. § 2B1.1. *See* U.S.S.G. App. A. The superficial difference between stealing and infringement is that one physically dispossesses the victim of his property and the latter does not. However, the EEA punishes those who steal trade secrets without dispossessing

3

the victim of his trade secret, and even after a trade secret is physically stolen, the victim may still use the information itself. .

An EEA attempt or conspiracy is sentenced under U.S.S.G. § 2X1.1 (Conspiracies, Attempts, and Solicitations), which uses the offense level calculated under U.S.S.G. § 2B1.1 and decreases the base offense level 3 levels "unless the defendant completed all the acts the defendant believed necessary for successful completion of the substantive offense or the circumstances demonstrate that the defendant was about to complete all such acts but for apprehension or interruption by some similar event beyond the defendant's control." U.S.S.G. § 2X1.1(b)(1),(2). The 3-point reduction will rarely apply in EEA attempt cases resulting from undercover stings because in those operations the defendant has generally completed all necessary acts short of the actual receipt of what the defendant believed was a trade secret.

This appropriate loss figure is "the greater of actual loss or intended loss." U.S.S.G. § 2B1.1 cmt. n.3(A). "Actual loss" is "the reasonably foreseeable pecuniary harm that resulted from the offense," whereas "intended loss (I) means the pecuniary harm that was intended to result from the offense; and (II) includes intended pecuniary harm that would have been impossible or unlikely to occur (e.g., as in a government sting operation, or an insurance fraud in which the claim exceeded the insured value)." *Id.* cmt. n.3(A)(i-ii). The Defendant's case involved a government sting operation, which results in the appropriate loss measure being the intended harm to the victim, Swedish Match.

For illustration, Guideline § 2B1.1's application notes outline a number of general methods for calculating the loss, many of which are included as methods to estimate the loss:

- "[T]he reasonably foreseeable pecuniary harm that resulted from the offense," U.S.S.G. § 2B1.1 cmt. n.3(A)(i);

- "The fair market value of the property unlawfully taken or destroyed; or, if the fair market value is impractible to determine or inadequately measures the harm, the cost to the victim of replacing that property," n.3(C)(i);
- "The cost of repairs to damaged property," n.3(C)(ii);
- "The approximate number of victims multiplied by the average loss to each victim," n.3(C)(iii);
- "The reduction that resulted from the offense in the value of equity securities or other corporate assets," n.3(C)(iv);
- "More general factors, such as the scope and duration of the offense and revenues generated by similar operations," n.3(C)(v); and
- "[T]he gain that resulted from the offense as an alternative measure of loss[,] only if there is a loss but it reasonably cannot be determined," n.3(B).

The best loss measure is not clear cut, but should be based on the intended harm to the victim, Swedish Match. In this case, the defendant only paid $1,000 for the trade secret. This, however, is not the true intended harm to the victim and grossly under-represents the potential harm. The defendant attempted to obtain the starter tobacco in an effort to develop a product to compete with Swedish Match's moist snuff tobacco products. The amount of starter tobacco purchased could be used to make an unlimited supply of moist snuff tobacco to compete with Swedish Match. Swedish Match, and its successors, spent untold amounts of dollars and man hours in researching and developing the starter tobacco. For the reasons articulated below, the value of the trade secret is the potential loss in market share and the of research and development of this starter tobacco.

Few reported federal criminal decisions describe how to value trade secrets, but those that do tend to focus on the trade secret's research and development costs. In *United States v. Wilson*, 900 F.2d 1350 (9th Cir. 1990), a mail fraud case, a research associate offered to sell financial and research data from his employer, a biotechnology and pharmaceutical firm, to a competitor. The defendant argued that the documents were worth their fair market value: the $100,000 to $200,000 that the competitor said it would have paid for them—the competitor worked with law enforcement to set up a sting—or the $200,000 that the defendant had said that he would sell them for. *Id*. at 1356. The Ninth Circuit, however, noted its "refus[al] to require a strict market value approach in determining the value of stolen goods," because that approach "measures only the gain to the defendant while virtually ignoring the harm suffered by the victim." *Id*. (citations omitted). Although the court acknowledged that the buyer's and seller's prices were relevant, it held that the trial court was entitled to value the documents at the victim's research and development costs for the information contained in the documents, especially because those costs indicate the intended loss to the victim. *Id.* Those costs totaled $4 million, although the trial court generously reduced the total by 75 percent, to $1 million, to give the defendant the benefit of every doubt. *Id*. at 1355.

Similarly, in *United States v. Ameri*, 412 F.3d 893, 900 (8th Cir. 2005), an employee stole his employer's proprietary software, which the evidence showed was at the heart of a $10 million contract, had no verifiable fair market value because it was not available separately, alternatively had a fair market value of $1 million per copy, and was developed for about $700,000. Faced with these figures, the Eighth Circuit affirmed the trial court's loss estimate of

6

$1.4 million, which appears to be the $700,000 in development costs times 2, the number of copies the defendant made. *Id.* at 900-01.

Finally, *United States v. Kwan*, No. 02 CR. 241(DAB), 2003 WL 22973515 (S.D.N.Y. Dec. 17, 2003), considered whether "proprietary hotel contact lists, hotel rate sheets, travel consortium contact lists, travel consortium rate sheets, and cruise operator rate sheets"—all useful in the travel industry—met the jurisdictional threshold for interstate transportation of stolen property under 18 U.S.C. § 2314 by being worth more than $5,000. *Id.* at *1. The court found most persuasive an argument for a value over $5,000 based on the documents' cost of production, which it estimated by noting the salary of people who created the documents and the amount of time they would have spent gathering the information and creating the documents. *Id.* at *9 & n.12. In all these cases, the loss or market value was defined largely by development costs.

Some civil trade secret cases have measured the replacement cost using the victim's research and development costs. *See Salsbury Labs., Inc. v. Merieux Labs., Inc.*, 908 F.2d 706, 714-15 (11th Cir. 1990) (holding that research and development costs for misappropriated vaccine were a proper factor to determine damages); *cf. University Computing Co. v. Lykes-Youngstown Corp.*, 504 F.2d 518, 538 (5th Cir. 1974) (holding that development costs should be taken into consideration with a number of factors, including "the commercial context in which the misappropriation occurred"). But *see Softel, Inc. v. Dragon Med. & Scientific Communications, Inc.*, 118 F.3d 955, 969 (2d Cir. 1997) (holding that it is usually appropriate to measure damages based on development costs and importance of secret to plaintiff only after a defendant completely destroys the value of the trade secret).

The starter tobacco that the Defendant attempted to steal was being stolen to develop a moist snuff brand to compete with Swedish Match. One relevant intended loss analysis is the potential effect, intended loss, on Swedish Match of losing market share to a competing moist snuff product. The United States will presented a representative of Swedish Match at sentencing and it is expected that he will testify to the potential effects of losing even a small percentage of market share of the moist snuff tobacco market. According to Swedish Match, the total market for moist snuff in the United States is approximately 1.3 billions cans per years. One share point, one percent of the market, represents approximately 13 million cans. Using a weighted average for all moist snuff brands, Swedish Match makes approximately $.74 for each can of moist snuff sold. Losing one share point would cost Swedish Match approximately $9.62 million per year. The following demonstrates the range of potential loss to Swedish Match based on potential loss of market share:

- .1% loss of market share: 1.3 million cans x $.74 = $962,000 per year
- .2% loss of market share: 2.6 million cans x $.74 = $1.924 million per year
- .3% loss of market share: 3.9 million cans x $.74 = $2.886 million per year
- .4% loss of market share: 5.2 million cans x $.74 = $3.848 million per year
- .5% loss of market share: 6.5 million cans x $.74 = $4.81 million per year
- .6% loss of market share: 7.8 million cans x $.74 = $5.772 million per year
- .7% loss of market share: 9.1 million cans x $.74 = $6.734 million per year
- .8% loss of market share: 10.4 million cans x $.74 = $7.696 million per year
- .9% loss of market share: 11.7 million cans x $.74 = $8.658 million per year
- 1% loss of market share: 13 million cans x $.74 = $9.62 million per year

The United States will present evidence at sentencing indicating that if GTT, or anyone else for that matter, developed an equivalent, competing product then Swedish Match could easily lose several share points.  The United States is suggesting $1 million as a reasonable and conservative estimate of intended loss in this case because the figure, while high on its face, is actually conservative relative to the potential economic impact of even losing a small percentage of market share.

The Defendant was associated with a company capable of manufacturing a competing moist snuff product.  He took the starter tobacco with the intent of using it to develop a competing product.  Although he only paid $1,000 to the Swedish Match employee for the starter tobacco, the starter tobacco could have been used to make an unlimited supply of a competing product.  The $1,000 figure does not begin to encompass the intended loss in this case.

In addition, the research and development costs associated with the starter tobacco are substantial.  It is impossible to specifically quantify the actual costs of research and development involved.  The research and development of the starter tobacco, however, is an involved process that has taken years and countless man hours.  The United States will present evidence at sentencing that the actual cost is in the hundreds of thousands if not millions of dollars.  Further, if GTT attempted to develop an equivalent starter tobacco it would likely have taken years to develop and hundreds of thousands of dollars of research and development costs.  The attempted theft of this starter tobacco trade secret was an attempt to short circuit the research and development process and eliminate the associated costs.  These costs were previously incurred by Swedish Match and its successors.

WHEREFORE, the United States respectfully asks the Court to sentence the defendant based on an intended loss amount of more than $1 million, which results in a total adjusted offense level of 19.

        Respectfully submitted,

        DAVID J. HALE
        United States Attorney


        */s/ Bryan R. Calhoun*
        Bryan R. Calhoun
        Assistant United States Attorney
        510 West Broadway, 10th Floor
        Louisville, Kentucky 40202
        PH: (502) 625-7064


## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing response was sent by electronic transmission through the Court's ECF system on this 27th day of September, 2011, to defense counsel.

        */s/ Bryan R. Calhoun*
        Bryan R. Calhoun
        Assistant United States Attorney